# 98 DTA 142

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL VI DE CAGUAS/HUMACAO/GUAYAMA
### PANEL I

SARA MINGUELA LAUREANO Y BERNARDO MILLAN,
POR SI Y EN REPRESENTACION DE LA SOCIEDAD LEGAL
DE GANANCIALES QUE AMBOS COMPONEN
Demandantes-Apelados

v.

ALMACENES PITUSA, INC. Y AMERICAN INTERNATIONAL
INSURANCE CO. OF PUERTO RICO
Demandados-Apelantes

Núm. KLAN-97-001044

San Juan, Puerto Rico, a 26 de marzo de 1998

Panel integrado por su Presidente, Juez señor Brau Ramírez, y los Jueces señor Colón Birriel y señora Pesante Martínez

Pesante Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Almacenes Pitusa, Inc., y su compañía aseguradora, American International Insurance Co. of Puerto Rico, procuran obtener la revocación de una sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Humacao. Mediante la aludida sentencia se les condena a pagar en forma solidaria la suma de $60,000.00 a la co-demandante Sara Minguela Laureano por concepto de los daños físicos y sufrimientos y angustias mentales ocasionados por la acción negligente de los

demandados; $15,000 al co-demandante Bernardo Millán Vélez por las angustias y sufrimientos mentales; $5,274.42 a la sociedad de bienes gananciales compuesta por los demandantes por concepto de gastos médicos y medicinas incurridos en el tratamiento médico de la co-demandante Sara Minguela Laureano. Se les condena, además, a pagar a la parte demandante $6,000.00 de honorarios de abogados más las costas e intereses legales a partir de la fecha en que se presentó la demanda.

Insatisfechos con la sentencia en controversia acuden ante nos mediante el recurso de apelación del epígrafe. En su escrito señalan la comisión de varios errores que podríamos resumirlos en errores relativos a la apreciación de la prueba, en la concesión exagerada de daños, al negarse el tribunal a admitir en evidencia una videocinta que captaba imágenes de la demandante conduciendo un vehículo de motor y al admitir prueba sobre la incapacidad del Seguro Social otorgada a la demandante sin ésta haber sido previamente anunciada. También señalan los apelantes en su recurso que el tribunal erró al conceder una partida para gastos médicos sin que éstos estuvieran sustentadas por la correspondiente evidencia, en la determinación de temeridad y la otorgación de la consiguiente partida de honorarios de abogados y al conceder intereses legales sobre las costas y honorarios de abogados desde la presentación de la demanda.

Por los fundamentos que más adelante habremos de exponer modificamos la sentencia en controversia.

## I

El 23 de septiembre de 1994 los demandantes-apelados, Sara Minguela Laureano y Bernardo Millán Vélez por sí y en representación de la Sociedad Legal de Gananciales compuesta por ambos presentaron demanda en daños y perjuicios contra Almacenes Pitusa, Inc., y American International Insurance Co. of Puerto Rico. En la misma alegaron que el 1 de julio de 1993 la demandante Sara Minguela Laureano sufrió un accidente en la Tienda Pitusa de Humacao al resbalar en un charco de agua que había en el piso de dicho establecimiento comercial. La demandante adujo que la caída le produjo múltiples traumas, tanto físicos como mentales. Reclamó por tal concepto que los daños le fueran resarcidos, al igual que los sufridos por su esposo.

Oportunamente, la parte demandada contestó la demanda negando entre otras cosas la negligencia imputada. Levantó como defensas afirmativas que el accidente fue causado por la negligencia de un tercero o la propia culpa o negligencia de Doña Sara. En la alternativa, consignaron que su negligencia contribuyó sustancialmente a la ocurrencia del mismo. Alegó además, que la acción estaba prescrita y que ellos no eran aseguradores de la seguridad de los clientes del negocio. Así también, arguyeron haber cumplido con sus obligaciones hacia sus clientes como dueños y operadores de un establecimiento comercial.

Trabada la controversia y luego de varios incidentes procesales usuales en este tipo de casos, se celebró la vista en su fondo. Por la parte demandante declararon los demandantes, su hija Elsie Millán Minguela, y los peritos Dres. Cándido R. Martínez y Carlos Vargas Villanueva, el primero doctor en medicina física y rehabilitación y el segundo, siquiatra. Por la parte demandada declararon el señor Iván Tirado López, gerente de la tienda Pitusa de Humacao y los Dres. Luis Cotto Ibarra y Haydee Costas Suárez, fisiatra y siquiatra respectivamente. También atestaron la señora Gladys Cerpa y el señor José A. Rodríguez, con cuyos testimonios intentaron autenticar una videocinta, la cual no fue admitida en evidencia por no reunir la suficiente garantía de confiabilidad.

Concluida la vista y habiendo examinado la totalidad de la prueba testifical y documental, el tribunal dictó sentencia según los términos previamente expuestos.

Con el beneficio de los autos originales, la comparecencia de las partes, una exposición estipulada de la prueba que a su vez incorpora una transcripción privada de los testimonios ofrecidos ante el Tribunal de Primera Instancia, avalamos su dictamen con excepción a la determinación de temeridad y la fecha a partir de la cual se pagaran los intereses sobre las costas.

## II

El 1 de julio de 1993 aproximadamente a las 3:30 P.M., Doña Sara, su esposo Bernardo, su hija Elsie, la cuñada Juana Millán (hermana de Don Bernardo) y su nieto de 5 años Misael llegaron en su

automóvil al Centro Comercial de Humacao donde ubica la Tienda Pitusa. Don Bernardo y su nieto Misael permanecieron fuera de la tienda en un área donde están ubicados unos bancos esperando a que Doña Sara, Elsie y Doña Juana hicieran la compra.

En un momento determinado, en el interior de la tienda, Doña Sara se separó de su hija Elsie y de su cuñada Juana y se dirigió hacia una de las neveras de cristal a buscar unos jugos congelados. *"Iba caminando y habían unas neveras alta en cristal...chequeé y como no estaba ahí, viré y di la vuelta por el pasillo y al dar la vuelta para ir hacia donde estaban los congelados, resbalé y caí... Caí hacia atrás, boca arriba con mi brazo [izquierdo] debajo de mi cuerpo... Luego de caerme, me di cuenta que había agua en el piso...bastante grande [el charco]... Cuando iba a tratar de levantarme, vi un muchacho que se me acercó y me dio la mano... para levantarme... Era un empleado, porque él estaba cerca de las neveras...arreglando los congelados".* ■

Según el testimonio de Doña Sara, antes de caerse no se percató de la existencia del agua en el piso dado el color claro del piso y la trasparencia del agua.

El empleado que la ayudó a levantarse le recomendó que fuera al área del frente de la tienda e informase del accidente al gerente. Cuando se dirigió al área indicada se encontró con su cuñada Doña Juana y le relató lo sucedido. Esta le dijo que no se fuera de la tienda porque tenía el brazo rojo. Minutos después habló con uno de los gerentes y al indicarle lo sucedido éste le ignoró y llamó por el altoparlante para que pasaran a secar el charco. Al ella insistir en lo de la caída y que tenía mucho dolor el gerente fue a avisar a otro gerente de la tienda.

Luego de esperar por el referido gerente, alrededor de 15 minutos, éste llegó y se dirigieron a la oficina donde le invitó a entrar y le ofreció disculpas por el retraso. Le llenaron allí los papeles del hospital, los cuales le entregaron. Para irse y llegar hasta el carro para trasladarse al Hospital Ryder de Humacao, recibió ayuda de su hija Elsie, su cuñada y su esposo. ■

El propio testigo de la demandada, señor Iván Tirado López, gerente de la Tienda Pitusa, redactó un documento intitulado Aviso de Accidente a la Tienda, donde informó como causa del accidente un líquido en el piso en el área de los jugos congelados y que la situación del líquido en el piso se *"corrigió inmediatamente".* ■ Este declaró que la Tienda Pitusa de Humacao tiene alrededor de 150 empleados y que cada uno de ellos es responsable del mantenimiento. Lo anterior, independientemente del área específica en que esté trabajando. Para enfatizar su aseveración declaró: *"[S]omos responsables de que si ahora mismo aquí, delante del señor Juez, se me cae un vaso de agua, yo debo quedarme en el área y llamar a otro compañero que pase a secarme esa área en ese caso, o yo salir corriendo y buscar un mapo, un paño, un papel toalla y secarlo yo mismo. Si fuese ese el caso".* ■ No obstante, declaró que en la Tienda hay asignadas tres personas encargadas del mantenimiento en el turno diurno y cinco empleados en el turno nocturno. ■ Alegó desconocer de la existencia de un estudio tendente a demostrar si esa cantidad de empleados resultaba ser suficiente para el mantenimiento de toda la tienda. Manifestó desconocer el tamaño del establecimiento comercial. No sabe la cantidad de personas que entran a la tienda ni la cantidad de artículos que se caen o se rompen.

En el informe de Aviso de Accidente el Gerente Tirado López consignó el nombre del empleado que estaba trabajando ese día en el área en que se cayó Doña Sara, así como también que como resultado de la inspección del sitio del accidente la condición quedó corregida. Intentó restarle importancia a ese dato al declarar que luego de referir a Doña Sara al hospital, él fue a cotejar el área de las neveras de los congelados y todo estaba normal.

El testigo admitió que el derrame de líquido o agua en el piso puede constituir una condición peligrosa.

Surgió del testimonio en corte abierta del Gerente Tirado López que no todo el que se queja de haberse caído es referido por ellos al hospital. En el caso que nos ocupa, él la refirió dado el hecho que le creyó que se hubiese caído. *"En el momento en que yo entrevisto al cliente y veo la condición o hago la apreciación mía personal, le doy el referido".* ■

Concluido los trámites administrativos en la Tienda, Doña Sara fue trasladada al Hospital Ryder por sus familiares. Su hija Elsie tuvo que guiar puesto que la condición de Doña Sara se lo impedía y su esposo no sabe guiar. Doña Sara fue atendida en la Sala de Emergencia de dicho hospital, le tomaron radiografías, las cuales fueron negativas para fracturas y dislocaciones, le dieron pastillas para el dolor y le colocaron un vendaje enyesado en su brazo izquierdo. La refirieron a un ortopeda y a un fisiatra. ▮

La demandante tuvo el vendaje enyesado en el brazo izquierdo durante ocho (8) días, el cual le fue removido por órdenes del ortopeda, Dr. Manuel Suárez, a quien acudió. También fue tratada en fisioterapia por la fisiátra, Dra Doris Pérez, a donde acudió el 24 de agosto de 1993 y le diagnosticó *"cervico-trapezius myositis"*. La Dra. Pérez le recetó medicamentos y la sometió a siete (7) tratamientos y sesiones de fisioterapia con ligero o algún alivio para Doña Sara. ▮

En el juicio ambas partes aportaron prueba pericial. En lo pertinente a la condición física de Doña Sara, el Dr. Cándido R. Martínez, fisiatra de Doña Sara, con 34 años de experiencia en su campo, brindó su diagnóstico el cual está recogido en tres informes periciales preparados por él y admitidos en evidencia sin objeción de la parte demandada. Contrario a la contención de los demandados, surge claramente del expediente ante nuestra consideración que tanto el Dr. Martínez como el tribunal *a quo*, para sus respectivas determinaciones, tomaron en consideración el expediente de Doña Sara en el Fondo del Seguro del Estado y que data de fechas anteriores a la caída en la Tienda Pitusa.

En términos generales y en términos de fácil comprensión, como resultado y consecuencia directa del accidente, Doña Sara sufrió traumas en su brazo y codo izquierdo, cadera izquierda en su aspecto posterior, en la región cervical y supraescapular izquierda y en las rodillas.

El Dr. Martínez declaró que Doña Sara, a consecuencia directa e inmediata del accidente tiene: (a) un esguince cervical, postraumática; (b) espicondilitis humeral medial del brazo izquierdo; (c) condición fronteriza de síndrome de Túnel Carpal en la muñeca izquierda, sintomática y (d) sacroielitis derecha. ▮

El síndrome de Túnel Carpal Derecho, el cual le fue operado, no está relacionado con el accidente objeto de este pleito, sino a una condición previa o pre-existente que aquejaba a Doña Sara y por la cual acudió al Fondo del Seguro del Estado.

El Tribunal le otorgó crédito al testimonio del Dr. Martínez. Como resultado de su evaluación y dictamen, los cuales el tribunal acogió, Doña Sara tiene unos impedimentos físicos de un ocho por ciento (8%) en el área cervical, que podría mejorar, pero no reducirse a menos de un cinco por ciento (5%) y un síndrome de túnel carpal fronterizo de la mano izquierda, con una limitación fisiológica por la pérdida de agarre (menos de quince libras) de un veinte por ciento (20%) de la extremidad, que corresponderá a un doce por ciento (12%) de la persona.

En términos de incapacidad física, la co-demandante tiene dificultad para incurrir en actividades que requieran extensión, flexión y rotación del cuello, al igual que está limitada por su pérdida de agarre en las manos. El Dr. Martínez calculó una incapacidad como ama de casa de un veinte por ciento (20%) de lo cual una tercera parte es producida por su condición de la mano derecha. ▮

El Tribunal de Primera Instancia, en su elaborada sentencia avala la opinión del Dr. Martínez en lo pertinente a la condición, limitación e incapacidad de Doña Sara al señalar que éstas no eran preexistentes o previas al accidente y que la demandante no tenía problemas en el área cervical o en el hombro o brazo y muñeca izquierda que requirieran tratamiento por el Fondo del Seguro del Estado, y menos una fijación de incapacidad (El Fondo del Seguro del Estado no le otorgó incapacidad y no le brindó tratamiento para estas condiciones), pudiéndose concluir, por preponderancia de la prueba desfilada y admitida y por el cuadro clínico descrito, que tanto la condición cervical, como la condición de túnel carpal de la mano izquierda, así como su condición de esguince sacrolíaco izquierdo, son el producto y compatibles en forma directa e inmediata con la caída y accidente sufrido por Doña Sara en 1ro. de julio de 1993. ▮

Además del deterioro físico, Doña Sara ha experimentado una condición de desorden emocional.

Antes del accidente ésta no tenía historial de condición emocional y nunca había recibido tratamiento siquiátrico. En este aspecto ambas partes presentaron peritos. Los demandantes aportaron prueba, la cual fue creída y adoptada por el tribunal, tendente a demostrar que los problemas emocionales de la demandante son consecuencia directa de la caída en la Tienda Pitusa. Por el contrario, la parte demandada ofreció el testimonio de la Dra. Haydee Costas, siquiatra, el cual apuntaba a que la condición emocional fue previa al accidente.

Doña Sara comenzó a recibir tratamiento siquiátrico tres meses después del accidente. Esta se inició como paciente del Dr. Heriberto Laurido del Centro Instituto Neuropsicodinámico. El Dr. Laurido la trató hasta el 16 de noviembre de 1994, cuando pasó a ser paciente del Dr. Carlos Vargas Villanueva, del mismo Instituto. Al momento de la celebración del juicio continuaba recibiendo tratamiento siquiátrico con el Dr. Vargas Villanueva. Ella ha acudido a veinte citas y cada una de ellas tiene un promedio de duración de cuarenta y cinco minutos.

Originalmente se le diagnosticó un desorden depresivo mayor y posteriormente se determinó que la depresión o desorden emocional se debía a su condición física. Cónsono con lo anterior, se le diagnosticó un desorden de ansiedad (Organic Moot Disorder or Organic Disorder), el cual bajo el *"Diagnostic Statistical Manual of Mental Disorder"* publicado por la American Psychiatric Association, Washington, D.C., se le conoce ahora como *"Mental Disorder due to Physical or General Medical Condition"*.

De conformidad con el testimonio del Dr. Vargas Villanueva, la condición de Doña Sara se ha caracterizado por episodios de ansiedad, miedo, se siente inútil, falta de concentración y memoria, insomnio, irritabilidad, sufre pesadillas, pobremente motivada, con un pronóstico pobre. Su estado de ánimo sigue en deterioro, al igual que su relación con la familia, aislada, poco tolerante, sin motivación. ▆▆ Como parte de su tratamiento le han recetado varios medicamentos, los cuales continúa ingiriendo.

Surge del expediente ante nuestra consideración que Doña Sara fue declarada con una incapacidad total física y emocional por el Seguro Social. ▆▆

En su alegato la parte demandada señala como error del tribunal sentenciador el permitir a la parte demandante presentar prueba sobre la determinación de incapacidad del Seguro Social sin haberla anunciado previamente. Dicho error no se cometió. La prueba no fue sorpresiva. Se desprende de la transcripción que el 25 de abril de 1997 la parte demandante le remitió a la representación legal de los demandados, vía facsímil, copia de la decisión emitida por el Seguro Social a finales de marzo y notificada a mediados de abril de 1997. Lo anterior por razón del interés mostrado por la parte demandada durante la toma de deposición de Doña Sara. En esa ocasión se formularon preguntas relativas a si ésta había solicitado los beneficios del Seguro Social. En ese momento la agencia no había tomado una decisión por lo que tan pronto advinieron en conocimiento de la resolución declarándola incapacitada, se la remitieron a los demandados. ▆▆ Ante este cuadro fáctico no encontramos que el tribunal abusara de su discreción al admitir la prueba en cuestión.

Antes del accidente Doña Sara era una persona alegre y comunicativa. Era fanática del equipo de pelota profesional de los Criollos de Caguas. Asistía con su esposo a los juegos y además acostumbraba a ver a su esposo jugar softball. Gustaba asistir a reuniones familiares y a actividades de la iglesia. Disfrutaba de jugar dominó. Después del accidente no participa como antes de estas actividades así como tampoco visita a los feligreses de su iglesia. Tiene una autoestima pobre; se siente que no sirve para nada. Su esposo es quien la ha sustituido en el cuido de su nieto a quien ella cuidó desde que nació. Su esposo es el favorito de él (del nieto), antes era ella, lo que la hace sentir triste. ▆▆

Tanto los peritos de la parte demandante como los de los demandados coincidieron en que Doña Sara no estaba fingiendo, exagerando, creando o inventando unos síntomas.

Surge de los testimonios vertidos en el Tribunal de Instancia que la vida íntima de los esposos co-demandantes se ha afectado mucho. Después del accidente Doña Sara no comparte mucho con su esposo; ya no es cariñosa con él. Lo anterior motivado por el constante dolor en el cuello y en el brazo

izquierdo.

El Tribunal *a quo* incorporó en su bien fundamentada sentencia sus observaciones relativas a la forma y manera de declarar de Doña Sara. *"No puede estar ni mucho sentada, ni de pie, se altera de nada. Su forma de declarar, sus movimientos, su aspecto triste, sus gestos constantes e incomodidad, su forma de levantarse y sentarse y ponerse de pie; su buscar alivio poniéndose de pie en los recesos o al recesar durante el juicio por sus propios gestos o pedido, y su ingenua expresión de que no se sentía ni bien ni mal; que no podía explicar como se sentía, no dejaron duda en este tribunal, de que tal como lo certificaron los cuatro peritos, Doña Sara no estaba fingiendo o exagerando una condición, sino demostrándolo con su testimonio verbal y no verbal y que merecieron entero crédito y plena credibilidad al Tribunal".* ▪

Por su parte, Don Bernardo, quien está pensionado del Seguro Social por su condición del corazón y los nervios, también ha experimentado daños a consecuencia del accidente de su esposa. La ha tenido que sustituir en lo relativo al cuido de su nieto Misael. La asiste en las labores del hogar. Este manifestó su sufrimiento y pesar al ver a su esposa llorando constantemente y quejándose de dolores, al ver el desinterés en todo lo que antes le producía placer y satisfacción, al observar la frustración y desesperación que exterioriza su esposa al no poder hacer las cosas que hacía antes. Antes del accidente su esposa era dinámica, alegre, jovial. Después del accidente se ha tornado callada, llorosa y sus estados de ánimo cambiaron con facilidad. *"Su esposa es una mujer joven y ahora no funciona, afectando su vida intima".* ▪

Además de lo precedentemente consignado, la parte demandante aportó prueba a los efectos de establecer que han incurrido en gastos médicos y medicinas ascendentes a $5,274.42. A esos efectos mostraron facturas de deducibles y de las farmacias para Doña Sara. Aunque no se tuvo disponible, por no haberlos guardado, todos los recibos que acreditaban el monto total de los gastos, éstos en unión al testimonio de Don Bernardo, fue suficiente para acreditar los gastos incurridos en el renglón señalado.

Considerada y evaluada toda la prueba presentada y adjudicada la credibilidad que le merecieron los testigos de ambas partes, el Tribunal de Primera Instancia, Sala Superior de Humacao, fijó los daños físicos de Doña Sara Minguela Laureano en $40,000.00. Los daños emocionales, daños morales y sus sufrimientos y angustias mentales en $20,000.00. Con relación a este último renglón estimó los daños de Don Bernardo Millán Vélez en $15,000.00. De otra parte condenó a los demandados a pagar a la sociedad legal de gananciales compuesta por Doña Sara y Don Bernardo $5,274.42 por concepto de gastos médicos y $6,000.00 de honorarios de abogados más las costas e intereses legales a partir de la fecha de la presentación de la demanda. Modificamos la sentencia en controversia a los únicos efectos de eliminar la partida de honorarios de abogados. Así también, los intereses sobre las costas se pagarán a partir de la fecha en que éstas fueron fijadas y no a partir de la fecha en que la sentencia fue dictada.

### III

Las acciones en daños y perjuicios y la consiguiente responsabilidad derivada de actos u omisiones culposos o negligentes están gobernados por el artículo 1802 del Código Civil y la jurisprudencia interpretativa del mismo emitida por el Tribunal Supremo. 31 L.P.R.A. sec. 5141; *Gierbolini v. Employers Fire Ins., Co.*, 104 D.P.R. 853 (1976); *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979); *Jiménez v. Peregrina Espinet*, 111 D.P.R. 700 (1982); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990). *J.A.D.M. v. Centro Comercial Plaza Carolina*, __ D.P.R. __ (1993), **93 J.T.S. 26**, res. 19 de febrero de 1993; *Toro Aponte v. E.L.A.*, __ D.P.R. __ (1997), **97 J.T.S. 18** (1997), opinión de 31 de enero de 1997.

El artículo 1802 establece que:

*"El que por acción u omisión causa daño a otro interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."*

Para que exista responsabilidad civil bajo el precitado artículo se requiere que concurran los

siguientes factores: (1) que efectivamente se haya sufrido un daño; (2) que haya un nexo o relación causal entre el daño sufrido y la acción u omisión de otra persona y (3) que en el acto u omisión intervenga culpa o negligencia, *Sociedad de Ganaciales v. González Padín, Co., Inc.,* 117 D.P.R. 94 (1986); *Ramírez Salcedo v. E.L.A.,* __ D.P.R. __ (1996) y **96 J.T.S. 41,** opinión del 19 de marzo de 1996; *Tormos Arroyo v. Departamento de Instrucción,* __ D.P.R. __ (1996), **96 J.T.S. 34,** opinión de 13 de marzo de 1996; *Monllor Arzola v. Sociedad de Ganaciales,* __ D.P.R. __ (1995), **95 J.T.S. 77,** opinión de 13 de junio de 1995.

La culpa o negligencia es la falta del debido cuidado; es no anticipar y prever las consecuencias naturales que determinado acto u omisión generen. Lo anterior debe ser examinado desde la óptica de una persona prudente y razonable, es decir, lo que una persona prudente habría de anticipar en las mismas circunstancias. *Toro Aponte v. E.L.A., supra.*

A su vez, el profesor Herminio Brau del Toro define al acto negligente como:

[E]l quebrantamiento del deber impuesto o reconocido por ley de ejercer, como lo haría un hombre. prudente y razonable, aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución que las circunstancias del caso exijan, para no exponer a riesgos previsibles e irrazonables de daños como consecuencia de la conducta del actor, a aquellas personas que, por no estar ubicadas muy remotas de éste, un hombre prudente y razonable hubiese previsto, dentro de las circunstancias del caso, que quedan expuestos al riesgo irrazonable creado por el actor. Por tanto, para que ocurra un acto. negligente tiene que existir un deber de cuidado impuesto o reconocido por ley, y el quebrantamiento. de este deber. Esto significa que en cada situación de hechos, la ley impone al actor observar un *"estándar de cuidado"* que será determinado por las circunstancias particulares del caso. Brau del Toro, Herminio M., *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* **Publicaciones J.T.S.,** 1986, pág. 183.

El artículo 1802 está predicado, entre otros, en el principio de causalidad adecuada. El mismo. postula que *"causa es aquella que comúnmente produce el daño". Estremera v. Inmobilaria R.A.C., Inc.,* 109 D.P.R. 852 (1980); *Elba A.B.M. v. U.P.R., supra; Toro Aponte v. E.L.A., supra.* Es por ello que un demandado responde en daños si su negligencia, sea ya ésta por acción u omisión, es la causa próxima del daño, aun cuando no sea la única causa del mismo. *Velázquez v. Ponce,* 113 D.P.R. 39 (1982). Al determinar si una acción u omisión es la causa próxima, adecuada o eficiente de unos daños, es preciso hacer una retrospección del acto negligente para ver si éste constituye la consecuencia razonable y ordinaria del daño. El principio de causalidad adecuada requiere que en todo caso de daños y perjuicios el demandante pruebe que la negligencia del demandado fue la que con mayor probabilidad causó el daño sufrido. *Sociedad de Ganaciales v. González Padín, supra.*

En el caso ante nuestra consideración los hechos acontecieron en un establecimiento comercial; razón por la cual resulta apropiado reproducir lo expresado en *Cotto v. C.M. Ins. Co.,* 116 D.P.R. 644 (1985): *"[e]s principio cardinal de derecho que cuando una empresa mantiene abierto al público un establecimiento con el objetivo de llevar a cabo operaciones comerciales para su propio beneficio, debe hacer lo posible por mantener dicho establecimiento en condiciones de seguridad tales, que los clientes no sufran daño alguno".*

Lo anterior en modo alguno se interpretará como que el dueño del establecimiento es un asegurador de la seguridad de los clientes del negocio; su deber sólo se extiende al ejercicio del cuidado razonable para la protección de la persona que acuda a su establecimiento. *Goose v. Hilton Hotels,* 79 D.P.R. 523 (1956).

En casos de responsabilidad extracontractual que surjan a consecuencias de caídas, es norma reiterada que el promovente de la acción, además de lo previamente expuesto, deberá probar la existencia de una condición peligrosa que ocasionó la caída y que dicha condición era de conocimiento de la parte demandada o que podría imputarse a ésta tal conocimiento. *Cotto v. C.M. Ins., Co., supra.*

A la luz del estado de Derecho y de los hechos particulares del presente caso es de rigor evaluar la determinación del tribunal *a quo* mediante la cual responsabilizó a la demandada por los daños

sufridos por la parte demandante.

Resulta poco menos que evidente que la causa próxima del accidente de Doña Sara lo fue la caída experimentada en la Tienda Pitusa el 1 de julio de 1993. Dicha caída fue motivada por la existencia de una condición peligrosa como lo fue un charco grande de agua clara en el área de las neveras y los congelados del establecimiento comercial. La peligrosidad de la condición fue reconocida por el propio gerente de la tienda. Esta condición debió ser conocida por la parte demandada. En el área en que ocurrió el accidente había un empleado de la tienda trabajando en los congelados; éste era encargado del mantenimiento y quien ayudó a levantar del piso a Doña Sara y posterior a la caída la orientó para que informase de lo acontecido al gerente.

Pitusa alegó que pese a que el día de los hechos estaba presente solamente uno de los tres empleados de mantenimiento, ello en modo alguno podía tomarse en consideración al determinar su negligencia puesto que todos sus empleados, independientemente de sus funciones, eran responsables por el mantenimiento de la tienda. Si ello hubiese sido así, no albergamos dudas que se hubiese corregido la situación peligrosa con relativa premura y no hubiese acontecido el accidente. La demandada no logró probar a satisfacción del tribunal que ejerció el suficiente control sobre los medios necesarios para evitar este tipo de ocurrencia. Así tampoco justificó las medidas preventivas encaminadas a lograr enterarse de las condiciones peligrosas que pueden previsiblemente aflorar en un establecimiento de este tipo, como tampoco qué medidas tomaba para corregirlas con premura. Lo anterior configuró la negligencia de la demandada.

Determinada la negligencia de Pitusa, procede atender el error señalado por la apelante en el sentido de que los daños de la demandante no son producto de la caída que ésta sufriera en la Tienda Pitusa, además de cuestionar la cuantía por entenderla exagerada. Estos errores no fueron cometidos.

El Tribunal de Primera Instancia le otorgó completa credibilidad a la prueba presentada por la parte demandante en lo referente a los daños sufridos por ésta. Del testimonio del Dr. Cándido R. Martínez se puede colegir que éste tomó en consideración la condición física de Doña Sara antes de la caída. Así también redujo a su incapacidad como ama de casa el porciento correspondiente a la condición preexistente y por la cual fue atendida en el Fondo del Seguro del Estado en ocasión anterior a la caída. De igual modo, en cuanto a la condición emocional de la demandante, el Tribunal creyó la prueba tendente a demostrar que previo al accidente ella nunca había recibido tratamiento siquiátrico y no tenía condición emocional alguna. El tribunal aquilató la prueba presentada tanto por la parte demandante como por la demandada. Fue claro que la misma resultó contradictoria. Sin embargo, le otorgó completa credibilidad a la primera no así a la presentada por Pitusa.

El ámbito de revisión judicial nos impone abstenernos de intervenir con las determinaciones de hechos y la apreciación que de la prueba hiciera el tribunal *a quo*. *"Es norma claramente establecida que en ausencia de error manifiesto, pasión, prejuicio o parcialidad no intervendremos a nivel apelativo con las determinaciones de hechos y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos"*. *Quiñones v. Manzano*, __ D.P.R. __ (1996), **96 J.T.S. 95;** *Orta v. Padilla Ayala*, __ D.P.R. __ (1995), **95 J.T.S. 21**, opinión de 8 de febrero de 1995.

Aun reconociendo que cuando se trata de prueba pericial y documental estamos en la misma posición que los tribunales de instancia para evaluar la prueba y llegar a nuestras propias conclusiones, no estamos ante un caso que amerite sustituir o descartar el testimonio pericial creído por la Sala Superior de Humacao. *Ramos Robles v. García Vicario*, __ D.P.R. __ (1993), **93 J.T.S. 167,** opinión de 20 de diciembre de 1993.

En lo referente a la cuantía de daños otorgada a los demandantes, las mismas no son exageradamente altas ni ridículamente bajas.

*"El derecho a ser compensado por daños no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de daños".* *Agosto Vázquez v. F.W. Woolworth & Co.*, __ D.P.R. __ (1997), **97 J.T.S. 56,** opinión de 13 de mayo de 1997. Sabemos que la estimación de los daños no es tarea fácil, pero el juzgador tiene el deber de evaluar la prueba y otorgar una justa compensación basada en la misma evitando de esta manera que se desvirtúe el propósito del Art. 1802

de indemnizar un daño dándole un aspecto primitivo a la norma. *Riley v. Rodríguez Pacheco*, 119 D.P.R. 762 (1987); *Odriozola v. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985).

El récord del caso que nos ocupa contiene prueba en demasía para justificar la partida de daños concedida a la parte demandante. Además de los daños físicos, las partes experimentaron daños emocionales y pérdida de la capacidad del goce de la vida. Véase Amadeo Murga, Antonio J., El valor de los daños en la resonsabilidad civil (1997), Tomo I, págs. 220-231.

Tampoco procede que se revoque la partida concedida por concepto de gastos médicos. Los mismos fueron alegados adecuadamente en la demanda. Además, el testimonio de Don Bernardo, al cual el tribunal le concedió entera credibilidad, sustento la determinación de que los mismos ascendieron a $5,274.42.

Además de lo precedentemente señalado, la parte apelante le imputó error al Tribunal de Primera Instancia al no permitir que se presentara en evidencia, para fines de impugnación, una videocinta tomada el 9 de mayo de 1997 en la que aparecía Doña Sara conduciendo un vehículo de motor. Se quejan de que el tribunal ni siquiera aceptó la videocinta como prueba ofrecida, pero no admitida.

Arguye la apelante que en el juicio Doña Sara declaró que desde la caída no guiaba automóvil por razón de dolor en el cuello. Además, ésta atestó que le tenían que abrir y cerrar la puerta del automóvil y que no se podía doblar. Pitusa con el propósito de impugnar esa parte del testimonio de Doña Sara, intentó presentar en evidencia una videocinta tomada por la Sra Gladys Carpa. La misma captaba imágenes de Doña Sara conduciendo un vehículo de motor, y abriendo y cerrando con el brazo izquierdo la puerta del carro. Además, se reflejaban ciertas actividades que la demandante negó que pudiera realizar.

Al examinar el expediente ante nuestra consideración nos percatamos que en la deposición que le fuera tomada hay manifestaciones inconsistentes de Doña Sara en las cuales indicaba que con posterioridad al accidente ha guiado, pero siempre lo había hecho acompañada y por tramos cortos.

Si bien es cierto que el tribunal entendió que la pieza evidenciaria confrontaba problemas de autenticación y confiabilidad, los mismos nunca debieron llegar al extremo de negarle a la apelante el derecho de presentarla como prueba ofrecida, pero no admitida. *"Una corte de justicia carece de facultades para impedir que un litigante ofrezca cualquier evidencia que estime relevante. Si la corte cree que la evidencia no es admisible por cualquier razón legal, su deber es denegar su admisión, pero no puede impedir que el taquígrafo tome razón de la prueba ofrecida, para que este tribunal, al recurrirse a él, pueda determinar si fue o no errónea la negativa del tribunal inferior y si el perjuicio que pudo haber sufrido el recurrente justifica una revocación de la sentencia".* Pueblo v. Gelpí, 55 D.P.R. 750, 755-56 (1939). Véase, además, *Pueblo v. López Rivera,* 102 D.P.R. 359 (1974).

El Tribunal de Instancia no tenía discreción para negarse a admitir como evidencia ofrecida pero no admitida la videocinta. El error señalado se cometió. No obstante, el mismo no resultó perjudicial y no conlleva la revocación de la sentencia. Tuvimos acceso a la videocinta y pudimos pasar juicio de su contenido.

No albergamos dudas que la evidencia en discusión es pertinente a la controversia y admisible en evidencia, no obstante, de haberse admitido la misma no hubiese alterado el resultado del caso.

En cuanto a los honorarios impuestos a Pitusa entendemos que no proceden. En *Bonilla Medina v. P.N.P.*, __ D.P.R. __ (1996), **96 J.T.S. 33**, opinión de 13 de marzo de 1996 se dispuso lo siguiente:

La Regla 44.1(d) de Procedimiento Civil dispone que *"en caso que cualquier parte haya procedido con temeridad, el tribunal deberá imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado"*. 32 L.P.R.A. Ap. III, R. 44.1 (d). El objetivo de la imposición de honorarios de abogado es penalizar al litigante *"por su terquedad, contumacia e insistencia en una actitud desprovista de fundamentos, obligaba a otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito"*. *Fernández v. San Juan Cement Co.,* 118 D.P.R. 713, 718 (1987); *Soto v. Lugo,* 76 D.P.R. 444 (1954). Esta determinación depende de la sana discreción del

tribunal sentenciador. *Raoca Plumbing v. Transworld,* 114 D.P.R. 464 (1983). La partida de honorarios así concedida no se variará por un tribunal apelativo a menos que la misma sea excesiva, exigua o constituya un abuso de discreción. *Ramírez Anglada v. Club Cala de Palmas,* 123 D.P.R. 339 (1989).

No encontramos en el pleito de epígrafe que la demandada-apelante haya demorado la solución del caso, ni que el presente litigio se hubiese podido evitar, ni que por causas atribuibles a Pitusa los demandantes hubiesen tenido que incurrir en gestiones o gastos innecesarios o cualesquiera otras razones de igual tenor que ameritaran la imposición de honorarios de abogados por temeridad. Siendo ello así revocamos la partida concedida por este concepto.

Finalmente, le asiste la razón a la apelante al señalar que el Tribunal de Instancia erró al conceder intereses legales sobre las costas desde la presentación de la demanda. De conformidad con lo resuelto en *Andrades Rodríguez v. Pizza Hut Management Corp.,* __ D.P.R. __ (1996), **96 J.T.S. 74** y 93, opinión del 24 de mayo de 1996 y sentencia del 21 de junio de 1996, los intereses sobre las costas se pagarán a partir de la fecha en que el tribunal sentenciador fijó el monto de las mismas.

Por los fundamentos que anteceden y de conformidad con los términos previamente expuestos, se modifica la sentencia del Tribunal de Primera Instancia, Sala Superior de Humacao.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 98 DTA 142

**1.** Págs. 187 y 188 de la Transcripción y pág. 43 de la Exposición Estipulada de la Prueba.

**2.** Determinación de Hechos Núm. 11.

**3.** Exhibit 5 de la parte demandada.

**4.** Pág. 409 de la transcripción y pág. 75 de la Exposición Estipulada de la Prueba.

**5.** Pág. 410 de la transcripción y pág. 75 de la Exposición Estipulada de la Prueba.

**6.** Pág. 440 de la transcripción y pág. 79 de la Exposición Estipulada de la Prueba.

**7.** Determinación de Hechos Núm. 13.

**8.** Determinación de Hechos Núm. 14.

**9.** Determinación de Hecho Núm. 17, a la pág. 26 de la transcripción. Además, págs. 9 y 10 de la Exposición Estipulada de la Prueba.

**10.** La de la mano derecha no está relacionada por ser una condición previa. Véase pág. 20 a la 22 de la transcripción.

**11.** Determinación de Hechos Núm. 19.

**12.** Págs. 101-102 de la transcripción.

**13.** Determinación de Hechos Núm. 21 y pág. 26 de la Exposición Estipulada de la Prueba.

**14.** Págs. 114 y 115 de la transcripción y pág. 30 de la Exposición Estipulada de la Prueba.

15. Pág. 205 de la transcripción y págs. 45 y 46 de la Exposición Estipulada de la Prueba.

16. Determinación de Hechos Núm. 23.

17. Determinación de Hechos Núm. 24.

18. Pág. 235 de la Transcripción y pág. 47 de la Exposición Estipulada de la Prueba.